Attachment #1

## How the Program Works

   In order for a prisoner to be transferred, both the transferring country and the receiving country must agree to the transfer; the prisoner must also give his consent.  Additional specific conditions of eligibility are delineated in the various treaties.  Much of the practice and procedure for prisoner
transfers is governed by 18 U.S.C. § 4100 et seq.  A prisoner who is interested in transferring should apply to the Warden of the facility at which he is incarcerated, with the advice and assistance, if necessary, of a consular official of his home country.

   The decision to approve or deny a proposed transfer is committed to the discretion of the Department of Justice and is based upon the entire record of the offender.  The factors considered in determining the appropriateness of transfer include the seriousness of the offense and the prisoner's role in it, the existence of outstanding fines or restitution orders, the offender's prior criminal record (if any), the strength of the offender's ties to each country, and the likelihood that transfer of the prisoner will, in fact, promote his or her rehabilitation. Occasionally, special humanitarian concerns -- such as the terminal illness of a prisoner or a close family member -- are considered.  The Department of Justice collects information about each proposed transferee from a variety of sources and deliberates carefully before deciding.  The process usually takes at least three months.

**Guidelines for Evaluating Prisoner Applications for Transfer**.

(1) Likelihood of social rehabilitation.

Beyond the practical concerns of alleviating prison crowding and dealing administratively with foreign national prisoners, many of whom have very limited English language ability, the central rationale behind transferring foreign prisoners to their home countries is to facilitate the prisoner's social rehabilitation. Rehabilitation is, of course, one of the principal purposes of incarceration in civilized societies. This goal is expressly stated in the Preambles to most of the prisoner transfer treaties ("to provide better administration of justice by adopting methods furthering the offender's social rehabilitation," [Mexican treaty]; "facilitating [the prisoner's] successful reintegration into society," [Canadian treaty]; "further the ends of justice and social rehabilitation of sentenced persons," [COE Convention]). Prisoner transfer assumes that such social rehabilitation is more likely to occur in the prisoner's home country, closer to his family and within his own culture. In addition, since many foreign national prisoners will be deported when their sentences have been served, it may not make sense to further their adjustment to a society in which they will not be allowed to remain after release.

In evaluating whether social rehabilitation really will be furthered by transferring a prisoner, a number of factors are considered:

(a) Acceptance of responsibility. The acceptance of responsibility is a condition precedent for rehabilitation. Acceptance of responsibility is a positive factor for transfer, and is demonstrated by cooperation with the authorities, providing complete and candid information as to involvement in the offense, and/or the timely entry of a guilty plea.

(b) Criminal history. For purposes of evaluating rehabilitative potential, there is a difference between a low- level, minor, first-time or infrequent offender, and a career criminal. Contrast, for example, the rehabilitative potential of an offender who was paid a few hundred dollars to drive drugs into the United States, with that of a drug kingpin.

(c) Seriousness of the offense. The seriousness of the

offense, the critical factor in any sentencing decision, is equally important in evaluating whether serving out all or most of his sentence in the United States will do more for the prisoner's rehabilitation than transferring him to what may be a less punitive and possibly less lengthy incarceration.

(d)  Criminal ties to the sending and receiving countries.  If a prisoner has criminal ties to the receiving country, transferring him could well be more likely to facilitate reintegration into his criminal milieu than to facilitate rehabilitation into civil society.

(e)  Family and other social ties to the sending and receiving countries.  This is a critical factor for two reasons.  First, it is an important assumption of the prisoner transfer program that social rehabilitation is most likely near the prisoner's family, and least likely far away.  Second, the most likely prediction about the prisoner's behavior upon release is that he will reunite with his family.  If the prisoner's family is in the receiving country, it is far more likely that he will stay there.  If, however, that family is in the sending country, one must assume that the released prisoner will try to return to the sending country, not only negating any social rehabilitation benefits from transfer but also negating the prisoner's deportation as well. There are obviously any number of family situations, and no one rule can control every case.  Set out below is the general approach of the International Prisoner Transfer Unit when the prisoner has family members residing in the United States:

(i)  Prisoner is single and childless.  Where his parents and siblings live will be controlling for this category (except in the unusual case where the prisoner was raised by others in the receiving country);

(ii)  Prisoner is ceremonially married.  The location of the spouse is controlling.  The presumption is that the prisoner should be in the same country as his spouse;

(iii)  Prisoner has a common law spouse.  The location of the common law spouse can be very important, depending on the apparent longevity and stability of the common law relationship (that is, how close in practice the common law spouse is to a legal spouse) and whether any children, particularly still minor children, have issued from it (that is, how close the common law situation is to a traditional

family);

(iv)  Prisoner is either single or separated and has children. The prisoner's relation to the children is critical.  For example, adult children living on their own in the United States would normally be less of a factor against transfer than minor children in the United States.  Minor children in the United States who have always lived with the other parent and never, or almost never, with the prisoner would be less of a factor against transfer than minor children for whom the prisoner had been the custodial parent or to whom the prisoner had otherwise been very close; in these cases, it is generally assumed that transferring the prisoner away from the children would not accomplish the social goals of transfer, and that the prisoner would attempt to return to the children upon release.

(f)  Transfers to third countries.  Occasionally, we are asked to transfer a prisoner whose most significant ties are neither to the receiving country nor to the sending country, but are to third country with which the United States does not have a treaty.  Such cases need to be carefully evaluated.  If the receiving country will accept the prisoner, if the prisoner is not a major violator, and if incarceration there seems to be in the prisoner's best interest, we will sometimes permit the transfer to take place.


(g)  Humanitarian concerns.  By this, we usually mean the terminal illness of the prisoner or a member of his immediate family. Occasionally, humanitarian concerns justify a transfer which would otherwise not be approved, so long as the transfer would not violate the treaty; an example of this would be the terminal illness of the prisoner himself.  Other times, humanitarian concerns are simply treated as another factor supporting transfer; an example of this would be the grave illness of a parent or child.  Illnesses for which the prisoner is being or could be treated in the United States, or the advanced age of parents, do not justify a transfer on humanitarian grounds.

(h)  Length of time in the United States.  Beyond the legal requirements in the treaties with a domiciliary clause (see above), length of time in the sending country is an important social factor.  If

the prisoner has been in the United States for such a long time that he has in fact become a member of this society, his social rehabilitation will not be facilitated by sending him to a different one.

(2)  Law enforcement concerns.

Social rehabilitation is not the only purpose of incarceration, and therefore cannot be the sole consideration in evaluating prisoner transfer requests or take precedence over all other objectives.  Law enforcement and justice concerns must also be considered, regardless of the possible consequences for the prisoner's social rehabilitation.  These considerations are the normal ones in any sentencing or parole decision:

(a)  Seriousness of the offense.  The more serious the offense, the more important the certainty of incarceration in the place it was committed becomes.

(b)  Public sensibilities.  Would the return of the prisoner to a foreign country so outrage public sensibilities because of the extremely serious nature of the prisoner's crimes or the circumstances surrounding the prisoner's crimes as to outweigh the rehabilitation considerations?

(c)  Public policy.  Would the return of the prisoner to a foreign country be contrary to the public policy of the United States?

(d)  Reintegration and renewed criminal activity in receiving country.  Are the prisoner's ties to criminal elements in his home country such that his return there would simply facilitate a resumption of his criminal activity?  Would transfer enhance the possibility of reprisal or intimidation.

(e)  Possible sentencing disparity.  When a prisoner is transferred, responsibility for administering his sentence belongs exclusively to the receiving country.  Under most of the bilateral treaties, the receiving country takes over the transferred sentence, but that sentence is then carried out under the laws and regulations of the receiving country, including any provisions for reduction of the term of confinement by parole, conditional release, good time release, or otherwise.  Under the French and Turkish bilateral treaties and the COE Convention, the receiving country has the additional option of converting the sending country's sentence, through either a judicial or

administrative procedure, into its own sentence; that is, the receiving country may substitute the penalty under its own laws for a similar offense. (There are certain limitations on converting the sentence. The receiving country is bound by the findings of facts insofar as they appear from the judgment, cannot convert a prison term into a fine, and cannot lengthen the prison term.) However, regardless of whether the sentence is continued or converted, responsibility for administering it rests solely with the receiving state.

(f) Law enforcement and prosecutorial needs in the sending country. These must be considered before transfer, since once the prisoner is transferred, the sending country no longer has any authority or control over him. Before approving transfer, the sending country must therefore consider factors such as:

(i) Is the prisoner's testimony needed against codefendants?

(ii) Are there fugitives in the prisoner's case whose apprehension would require the prisoner's presence to help make the case against the them?

(iii) Are there other open cases or investigations involving the prisoner?

(iv) Is there a need for further debriefing by law enforcement agents in the sending country?

(g) Unpaid court-ordered assessments, fines, or restitution. Because all supervisory authority over the prisoner is terminated when the prisoner transfers, financial obligations of the prisoner need to be settled prior to transfer.

(3) Likelihood of Return to the United States.
Allowing a foreign national prisoner to serve out the remainder of his United States sentence in his own country only makes sense if the prisoner will remain in his own country after his release. Therefore, a critical consideration in evaluating a transfer request is whether in fact the prisoner will stay in the receiving country, or will return to the sending country. We look at a number of factors in making this determination:

(a) Existing ties to the United States. This has been discussed

in detail under Family and other social ties to the sending and receiving countries, above.  The location of the prisoner's family, his residence and domiciliary status in the United States and the receiving country (for example, does he still own a residence in the United States, does he have any obvious residence in the receiving country), whether he had a non-criminal occupation or professional career in the sending or receiving country, the relative proximity of the receiving country's borders to the United States and how easy or difficult it would be as a practical matter to return to the United States, and his immigration status, are all factors to take into account in determining whether the prisoner would likely remain in the receiving country.

   (b)  Previous prisoner transfer.  If a prisoner has previously been the beneficiary of a treaty transfer, he is ineligible for transfer. Reapplications after a previous transfer are always denied.

   (c)  Previous deportations and illegal reentries.  Recent deportation(s) or numerous illegal entries into the United States will generally bar a treaty transfer.

 Special Considerations for State Prisoners.

   (1)  State approval required.

   Where a sentenced person has been convicted by a state of the United States of crimes under the laws of that state and is in the custody of authorities of that state (as opposed to having been convicted in the federal courts of a crime under the United States Code), the United States will not approve a transfer unless the state first gives it consent.

   (2)  Deference to state requests.

   Generally, the Department of Justice defers to a state's judgment, and approves the transfer of state prisoners approved by the state.

   (3)  Exceptions.

   A compelling federal interest will cause the Department to disapprove a state request for the transfer of one of its prisoners.  The most frequently invoked federal interest is the protection of our borders from illegal reentries by transferred prisoners.  Therefore, the

Department will always consider the likelihood that the prisoner will illegally return to the United States before giving final approval to a state request for transfer.